OPINION
Robert C. Piggott is appealing from his conviction, following his no contest plea, of one count of possession of marijuana and one count of possession of methamphetamine. On appeal, he attacks the decision of the trial court overruling his first motion to suppress evidence obtained as a result of what he argues was an unlawful arrest. He obtained new counsel and filed a second motion to suppress statements made by him after his alleged unlawful arrest. His arguments are presented pursuant to his two assignments of error, as follows:
 "A SEARCH AND SEIZURE CANNOT BE MADE PURSUANT TO AN ANTICIPATORY WARRANT UNLESS AND UNTIL THE SPECIFICALLY STATED TRIGGERING EVENT OCCURS AT THE PLACE SPECIFIED IN THE WARRANT.
 "UNMIRANDIZED STATEMENTS OF AN ILLEGALLY DETAINED SUSPECT MUST BE SUPPRESSED."
The trial court's decision on the issue raised in his first assignment of error, as well as the facts of the entire case, are set forth in its September 28, 2000, decision as follows:
"This matter is before the Court on Defendant's Motion to Suppress
filed August 11, 2000. A hearing on Defendant's motion was held in open court on September 13. United States Postal Inspector Suzanne McDonough, Detective Kevin Bollinger, and Detective Thomas Lubonovic testified for State.
 "I. FACTS
"Suzanne McDonough testified as follows. She has been employed by the United States Postal Service ("USPS") for thirteen years, and has been an inspector for the last five years. On June 20, 2000, she received a telephone call from an Inspector Hilburn in Phoenix, Arizona, who informed her that he had intercepted two Express Mail packages and was going to ship them by Express Mail to Inspector McDonough.
"These packages appeared suspicious in that they had been mailed to the same business and had what appeared to be the same handwriting on them, but had different return addresses, and had been mailed from separate post offices. The return addresses on both packages were checked through the United States Postal Service Address Management System. One was found to be non-existent and there was no such business in the city named. In addition, there was no directory listing for the sender's phone number. The return address on the other package was found to a legitimate address, but that address is a building with many suites and no suite number was listed. A reverse search on the phone number listed for this package returned no information. The recipient for both packages was `Glass Werks' at 1101 E. Second Street in Dayton, Ohio. The postal carrier for that area was contacted and he did not recognize the business name.
"Through her experience with similar packages and specialized training with both the USPS and the Drug Enforcement Agency, Ms. McDonough recognized these characteristics as common to parcels containing drugs and stated that persons shipping drugs often use different post offices to avoid attracting attention with bulk mailings. The use of non-existent addresses is also common.
"Inspector McDonough then contacted the Dayton Police Department to arrange for a canine unit `sniff' of the packages. At this time, the two parcels were at the airmail facility at the Dayton International Airport. She prepared two sets of four to five packages of similar size and shape each that included one of the suspicious parcels in each set. Detective Bollinger arrived with his canine Nicholas, who alerted on both of the suspect parcels. Inspector McDonough then prepared an application and affidavit for search warrants. One of these requested warrants included a `beeper warrant' for the placement of electronic transmitters on the packages which would enable police to track the location of the packages and identify when they were opened. The beeper was never installed, however, as it was determined that due to the layout of the delivery address, it would be difficult to tell which internal door the package went into and the postal service was worried they would not be able to retrieve these expensive devices. The beeper warrant was not withdrawn, but Inspector McDonough made a return to the court that states that no beeper was installed.
"Inspector McDonough also prepared applications and affidavits, including a signed affidavit on June 21 and they were approved that same day.
"After the warrants were obtained, the parcels were both opened. Inside each box was a duffel bag with a small lock on its zipper. When the zipper was opened, Inspector McDonough found several bricks of a substance which field-tested positive for marijuana. She repackaged the parcels and arranged with the Dayton Police Department for a controlled delivery to the intended addressee. It was by now late evening and the delivery was arranged for the next day, June 22. That evening, Inspector McDonough also received word that a man had inquired about the parcels which had been due to arrive that day at noon.
"On June 22, Inspector McDonough dressed as a postal carrier and drove a postal vehicle to 1101 E. Second Street. As she approached that address, she noticed a man, later identified as the Defendant, walking away from the building. She parked across the street and approached the mailboxes for the building, noticing a cardboard sign taped to the mailboxes that the number `2020' and an arrow pointing down. Within a few seconds, the Defendant returned and approached her. She told him that she had some packages for Glass Werks but wasn't familiar with the business and asked him if he knew of it. He said that he would accept delivery of the packages. She then asked him if he was the person who had called earlier about the packages and he replied that he was and had been on his way to call again when he saw her pull up.
"Another man who had been sitting on the steps nearby had come up with the Defendant and Inspector McDonough told them that because the parcels were so heavy she had left them in the postal truck and they could come with her to the truck to sign for them. The Defendant signed for both parcels, using the name `Alex Johnson,' and accepted both packages. Inspector McDonough tore off the delivery portions of the labels and the Defendant and the other man took the parcels with them away from the truck, each carrying one parcel. She then drove away from the scene, but was able to see members of the Dayton Police Department detain the men.
"Inspector McDonough testified that she was confident that the Defendant was the person for whom the packages were intended due to his statement that he had called to inquire about them and the fact that he signed for the delivery of both parcels.
"Detective Kevin Bollinger testified as follows. He has been with the Dayton Police Department for twenty-two years, and a detective and canine handler for eleven years. He is currently assigned to the Drug Interdiction Unit of the Narcotics Division and often works with the USPS in his interdiction activities. He has been working with his canine, Nicholas, since December 1999 and Nicholas was trained with U.S. Customs in narcotics detection. Det. Bollinger has over twelve hundred hours of canine training and has handled several hundred `sniffs.'
"His involvement with this case began when he was requested to respond to the Dayton International Airport airmail facility during the early afternoon of June 21. When he and Nicholas arrived, two problem sets containing several packages each were already set up in separate areas of the facility. Nicholas was brought to both sets of packages and he alerted clearly to the presence or odor of narcotics on both suspected parcels by biting and scratching at them. After the positive alerts, Det. Bollinger remained on the scene while the packages were opened and the marijuana was found inside.
"Detective Thomas Lubonovic testified as follows. He has been assigned to the Drug Interdiction Unit of the Dayton Police Department's Narcotics Division since 1987. On June 22, 2000, he was assigned to assist in the controlled delivery of the suspect parcels and in the `takedown' of the individual(s) to whom they were delivered. He and his partner, Det. Bollinger, were in a vehicle on East Second Street near #1101 and approximately one hundred to one hundred fifty feet away from where Inspector McDonough parked the postal truck. They left their vehicle when they observed the Defendant and another man accompany McDonough to the postal truck, receive the parcels and begin to walk back toward the building at #1101.
"The detectives approached the Defendant and the other man, later identified as Andrew Shaman, when they were almost back to the building. Det. Lubonovic approached the Defendant and Det. Bollinger went to Mr. Shaman. Det. Lubonovic identified himself as a police officer and asked the Defendant if the box was his. The Defendant replied that it was not, but belonged to a friend. Det. Lubonovic then placed the Defendant under arrest, cuffed him and read him his Miranda rights. When asked, the Defendant stated that he understood his rights. Det. Lubonovic asked the Defendant who his friend was and the Defendant replied that he did not want to answer any questions. No further questions were asked of the Defendant.
"A search was conducted of the Defendant's clothing after his arrest. A cloth pouch with a baggie inside containing a white powder was found in the front left pocket of his shorts. As it was pulled out, the Defendant stated that it was not his. A set of keys and a wallet were also found. Two small keys on the key ring were later found to fit the locks on the duffel bags which were inside the delivered parcels. In the Defendant's wallet, Det. Lubonovic found a ticket stub from an American Airways flight dated June 20, 2000, in the Defendant's name, for a trip from Phoenix, Arizona to Las Vegas, Nevada. The Defendant was also in possession of a date book/organizer which contained copies of the mailing labels for both parcels, as well as post office receipts from Tempe, Arizona and Scottsdale, Arizona which matched the amount of postage on each off the delivered parcels.
 "II. LAW AND ANALYSIS
"The Defendant argues that while the arresting officers did obtain a warrant authorizing the installation of an electronic tracking device to determine the parcels' location and when they were opened, the arresting officers actions in arresting the Defendant prior to the parcels being opened went beyond the scope of the warrant. He asserts that his arrest being illegal, the evidence flowing from that arrest must be suppressed.
"The Court finds Defendant's argument to be without merit and unsupported by the evidence presented. Warrants were obtained not only for the installation of a tracking device, but also for the opening of the packages themselves. Thus, there is no question that the opening of the packages which revealed marijuana was valid. None of the three warrants conditioned arrest on the Defendant opening the packages first.
"The Court notes that the Defendant has raised no challenge to the validity of the warrants themselves and the Court, having reviewed the applications and affidavits which supported them, finds that Magistrate Merz had a substantial basis for concluding that probable cause existed.See Illinois v. Gates (1983), 462 U.S. 213, 238-239; Spinelli v. UnitedStates (1969), 393 U.S. 410, 419. The warrants further describe with particularity the items to be seized. Crim.R. 41(B), (C); see also
O.R.C. § 2933.24(A).
"The only question, then, is the validity of the Defendant's warrantless arrest. Police officers are permitted to make a warrantless arrest for a felony not committed in his presence if there is reasonable grounds for making the arrest. United States v. Watson (1976),423 U.S. 411; United States v. Santana (1976), 427 U.S. 38. `The necessary inquiry, therefore, [is] not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest.' Watson, supra, 423 U.S. at 417. If probable cause exists, an arresting officer is not required to obtain a warrant in order to apprehend a suspected felon in a public place. Steagald v. UnitedStates (1981), 451 U.S. 204; see, also, State v. Timson (1974),38 Ohio St.2d 122. The probable cause needed to make a warrantless arrest constitutionally valid requires that the arresting officer, at the moment of the arrest, have sufficient information, based on the facts and circumstances within his knowledge or derived from a reasonably trustworthy source, to warrant a prudent man in believing that an offense had been committed by the accused. Beck v. Ohio (1964), 379 U.S. 89;see, also Gerstein v. Pugh (1975), 420 U.S. 103.
"In the case at bar, Det. Lubonovic had probable cause to arrest the Defendant. He had been informed from reliable sources, Det. Bollinger and Inspector McDonough, that the packages which were delivered to the Defendant contained marijuana, and had watched the Defendant sign for the packages and take possession of them. Possession of marijuana, a controlled substance, is a felony offense. See O.R.C. § 2925.11. Such information was more than sufficient for a prudent person to believe that the Defendant was committing a felony offense and his warrantless arrest was constitutionally valid.
"His arrest being legal, the search conducted incident to his arrest was also properly conducted. There is, therefore, no basis for the suppression of the evidence obtained thereby.
 "III. CONCLUSION
"Accordingly, Defendant's Motion to Suppress is hereby OVERRULED."
As we have recognized before, at a suppression hearing, the trial court serves as the trier of fact and must judge the credibility of witnesses and the weight of the evidence. State v. Fanning (1982), 1 Ohio St.3d 19,20, 437 N.E.2d 583, 584-585. In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies upon the trial court's ability to assess the credibility of witnesses, and independently determines, "without deference to the trial court, whether the trial court has applied the appropriate standard." State v. Baker (1997), 118 Ohio App.3d 654, 658, citing and quoting State v. Anderson (1995), 100 Ohio App.3d 688, 691,654 N.E.2d 1034, 1036.
We are, of course, mindful that the Supreme Court of the United States has held that "as a general matter, determinations of reasonable suspicion and probable cause should be ruled de novo on appeal." Ornelasv. U.S. (1996), 116 S.Ct. 1657, 1663. But the Supreme Court then added: "Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." State v. Gipp (Dec. 31, 1998), Montgomery App. No. 17369.
Under this first assignment of error, Piggott argues that he was arrested pursuant to an anticipatory warrant when the "triggering event" had not yet occurred, citing our case of State v. Nathan (Nov. 16, 2001), Montgomery App. No. 18911. The search warrant in Nathan
specifically included the following:
"Anticipatory Facts:
 "This search warrant will not be served unless one or both of the following criteria are met:
 "1. That a confidential and [*13] reliable informant (CI) enters 1749 or 1751 W. Grand Avenue and makes a controlled buy of illegal drugs.
 "2. That a confidential and reliable informant (CI) enters 1749 or 1751 W. Grand Avenue and sees illegal drugs."
In the case before us, Judge Michael Merz, Magistrate Judge of the United States District Court for the Southern District of Ohio, in Dayton, Ohio, issued an order which contains the following language:
"The Court finds:
 "A. There is probable cause to believe that the above referenced Express Mail parcel contains a narcotic or other dangerous controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 843(b), and
 "B. That there is probable cause to believe that whoever opens the above referenced parcel will have, by the act, committed, attempted to commit or facilitated the commission of, the above described offenses."
The appellant argues that this is an anticipatory order or warrant and since the appellant had not opened the package, he could not have been arrested for receiving the package. The appellant misconstrues the warrant in this case. As the trial court noted, this language contained in the total of three warrants issued herein did not condition arrest on the appellant opening a package first. The magistrate was merely pointing out that the opening of the package by its recipient would prove that the recipient was in possession of the contents. The magistrate did not present this scenario as an exclusive method of finding a recipient to be in possession of the contents of the package. The trial court carefully noted that the officer who effected the arrest had more than sufficient facts before him to give rise to probable cause to arrest the appellant.
We have independently and de novo reviewed the transcript of the suppression hearing on this issue, and we find that the trial court's decision is supported by competent, credible evidence. The first assignment of error is overruled.
The second assignment of error deals with statements made by the appellant to Inspector McDonough, masquerading as a postal carrier to deliver the parcels to the appellant, before he was arrested and placed in custody. A separate hearing was held on this issue after the second motion to suppress was filed by new counsel. The trial court's decision on this issue, filed on February 1, 2001, is as follows:
"This matter is before the Court on Defendant's Motion to SuppressSearch Evidence and Statements filed on November 1, 2000. The State filed a Memorandum in Opposition to Defendant's Motion to Suppress on January 5, 2001. Defendant filed a Memorandum in Support of Motion to SuppressSearch Evidence and Statements on January 11, 2001. This matter is properly before the Court.
"For the reasons set forth in the Decision, Order, and Entry ofSeptember 28, 2000, Defendant's motion is hereby OVERRULED as to the validity of the warrants, the officers' probable cause to make a warrantless arrest, and the search incident to the arrest.
"The Defendant argues that any statements he made must be suppressed because they were obtained illegally. The State argues that Defendant's conversation with Inspector McDonough occurred before he was placed in custody. Additionally, any statements made by the Defendant to the detectives prior to his arrest were made prior to his placement in custody. The Court agrees with the State.
"Only a custodial interrogation triggers the need for a Miranda rights warning. Berkemer v. McCarty (1984), 468 U.S. 420. In Miranda v.Arizona (1966), 384 U.S. 436, the United States Supreme Court defined the term as follows: `By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' The determination as to whether a custodial interrogation has occurred requires an inquiry into `how a reasonable man in the suspect's position would have understood his situation.' Berkemer, 468 U.S. at 442. As the United States Supreme Court later explained, `the ultimate inquiry is simply whether there is a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.' California v.Beheler (1983), 463 U.S. 1121, quoting Oregon v. Mathiason (1977),429 U.S. 492, 495.
"As our own Second District Court of Appeals has noted, `[Miranda] warnings are not required simply because questioning takes place in a station house or the person questioned is a criminal suspect.' Sate v.Trent (Dec. 23, 1999), Montgomery App. No. 17705, unreported, at *1, citing State v. Woodward (Oct. 17, 1994), Warren App. No. CA 94-04-046, unreported.
"In the case sub judice, the Defendant was not in custody at the time he had a conversation with the mail carrier or with the detectives. Inspector McDonough did not restrain the Defendant in any manner while she asked him casual questions about the package she was delivering. Further, the reasonable man would not feel that he did not have the freedom to leave or walk away from a conversation with a mail carrier. Thus, Inspector McDonough did not have to provide the Defendant withMiranda warnings prior to questioning him.
"The Court also finds that the Defendant was not in custody at the time he was questioned by the detectives. Once again, the Defendant was not restrained in any manner. Further, the detectives were dressed in plain clothes and were in public when they questioned the Defendant about the package he was carrying. A reasonable person would feel free to leave if he were approached in this manner. Thus, the detectives did not have to provide the Defendant with Miranda warnings before questioning him.
"The Defendant's statements in both instances were voluntarily made. Voluntary statements of any kind are admissible. See Miranda, supra. Thus, as the Defendant was not the subject of a custodial interrogation and made his statements voluntarily, any statements made by the Defendant need not have been preceded by a Miranda warning to be admissible.
"Defendant also requested a second evidentiary hearing in this matter. The Court finds that this request is not well-taken in light of Defendant's counsel having received transcripts of the first evidentiary hearing.
"Accordingly, Defendant's Request for an Evidentiary Hearing is hereby OVERRULED. Defendant's Motion to Suppress Search Evidence andStatements is hereby OVERRULED."
Again, we have independently and de novo reviewed the transcript of the suppression hearing and, again, we find that the trial court's decision is supported by competent, credible evidence, and we hereby approve it and adopt it as our own on the issue raised in the second assignment of error. The second assignment of error is overruled, and the judgment is affirmed.
WOLFF, P.J. and BROGAN, J., concur.